[Civ. No. 42829. Second Dist., Div. Five. May 5, 1975.]

CARLOTTO, LTD., Plaintiff and Appellant, v.
COUNTY OF VENTURA et al., Defendants and Respondents.

932

---

**COUNSEL**

Ruderman, Levin, Ballin, Plotkin & Graf, Jay Plotkin and Lawrence E. Silverton for Plaintiff and Appellant.

Dunne, Shallcross & Kane and Mark C. Kane for Defendants and Respondents.

## OPINION

KAUS, P. J.—On January 25, 1969, during an extremely heavy rainstorm, plaintiff Carlotto's[1] property was inundated by silt when a flood control system overflowed. The system was operated by defendants County of Ventura and the Ventura County Flood Control District. After a court trial, plaintiff obtained a judgment for about 12 percent of its total damage, or $55,000. Plaintiff appealed and defendants cross-appealed; the cross-appeal has been abandoned.

### FACTS

Most of the basic facts are undisputed.

Plaintiff is a plumbing fixture manufacturer located near the community of Piru in Ventura County. Up the hill from plaintiff's plant lies the Warring Canyon debris basin. Below the plant is the Santa Clara River. The basin and the river are connected by a flood control channel.

The Warring Canyon debris basin consisted of the following elements. First, there was an earthen dam. Behind the dam a basin was scooped out. The basin had a water level debris capacity of about 12.7 acre feet—or 43,560 cubic feet; however, since debris comes to rest on a slope, its actual capacity was between 23.3 and 38.5 acre feet. A concrete spillway in the dam was designed to carry water into the channel that led to the river. There was also an L-shaped pipe, which stuck up behind the dam; its horizontal portion ran along the floor of the basin and emptied into the channel below the spillway.

The purpose of the system is to control the flow of flood water and silt resulting from rainfall. As the water rises in the basin or reservoir, it is drained off through the pipe. When the water rises faster than the pipe can handle it, the water runs through the spillway and then into the channel. The system is not intended to store water; rather, the water is temporarily detained, debris remains in the basin and the water drains out in controlled fashion. During the dry summer months excessive debris that has accumulated in the basin should be cleaned out.

Thus, when the system is working properly, heavy debris, such as rocks and vegetation, sinks to the bottom of the basin, but the water and finer

---

[1]Carlotto, Ltd., a limited partnership, doing business as Robinson and Lamey Company.

silt particles flow out either through the pipe or through the spillway, into the channel. However, once the basin fills with debris, the additional debris will move through the spillway into the channel, filling the channel, and, eventually causing silt-laden water to break out of the channel and run across the surrounding countryside. Also, when the debris rises to the level of the basin, the drainage pipe clogs up and becomes useless.

Since the system is not intended to store water for any length of time, the capacity of the basin reflects only some—in this case, unknown—fraction of the system's ability to process flood waters and silt.

Defendants cleaned out the Warring Canyon debris basin in 1965 and 1967. However, in 1968, defendants, though requested, failed to clean out the basin. As a result, the Warring Canyon basin went into the rainy season of 1968-1969 already filled with 10.5 acre feet of debris, leaving only 2.5 acre feet of its entire 12.7 acre feet water level capacity.[2] Defendants' negligence in failing to maintain the debris basin by cleaning it out is undisputed at this point.

The rains started in October. The January 1969 rains were very heavy—the rainfall in late January was a 75-year event. The heaviest rain occurred on January 25, 1969. One hour before the rain finally stopped, the debris dam failed. Rocks and heavy debris spilled over the concrete spillway out into the channel below. The debris also overtopped the dam itself; the overflowing water carried debris from behind the dam, together with debris that had been piled in front of the dam in an earlier cleanout. The channel could not accommodate the increased flow and disgorged silt at several points. Altogether 64 acres of land, including plaintiff's property, were covered with 2 feet of mud or silt;[3] the mud penetrated all of the structures within plaintiff's plant area and damaged equipment and inventory.

The trial court summarized these events by finding that "the dam, unable to function properly, overtopped. . . . This flow caused debris, silt and mud to *plug and block* the channels below the dam. As a result, the channels overflowed and inundated approximately 64 acres of area downstream with silt including the property of the plaintiff." (Italics added.)

---

[2] 12.7 less 2.5 does not equal 10.5. Neither party makes anything of 0.2 difference and neither do we.

[3] Plaintiff has some quibble with the amount of mud. It is sufficient to note that the trial court's findings are supported by the evidence.

The court found plaintiff's total damages to be $456,032. It found also, however, that defendants' negligence was not the sole proximate cause of plaintiff's damage: "The defendants are found to be negligent, and their negligence was the contributing proximate cause of 12.1% of the plaintiff's proven damages. [¶] This contribution to plaintiff's damage is computed as follows: Approximately 128 acre feet of silt was deposited over a 64 acre area . . . as a result of the overtopping of the dam and the resulting breakout of the channel on January 25, 1969. The defendants' negligence in failing to clean out 10.5 acres of debris in the area behind the dam caused that much additional silt to be deposited. . . ." The court also found that the defendants had "negligently piled" about 5 acres of "loose materials" near the dam, so that when the dam overtopped and the channel overflowed, "this 5 acres of silt was carried by the waters . . . and . . . deposited upon" the 64 acres. "Thus, a total of 15.5 acre feet was so deposited representing 12.1% of the total silt deposited." The court then fixed defendants' liability at 12.1 percent of plaintiff's total damages, or about $55,000.

## DISCUSSION

Plaintiff contends that the trial court erred in computing damages. Specifically, plaintiff contends that the court improperly apportioned damages, because defendants did not affirmatively plead apportionment; that, in any event, the burden was on defendants to prove that they were not liable for the entire amount of plaintiff's damages; that the apportionment formula used by the court was improper; and, finally, that the court erred in deducting estimated income taxes from the total of plaintiff's damages.

Defendants suggest that there is no substantial evidence that its negligence caused any part of plaintiff's damage: plaintiff is therefore not aggrieved by the alleged errors.[4]

### Evidence of Causation

■ The burden was on plaintiff to show that defendants' conduct was a substantial factor in causing some harm. (*Singh* v. *Frye*, 177 Cal.App.2d 590, 593 [2 Cal.Rptr. 372]; see *Fibreboard Paper Products Corp.* v. *East Bay Union of Machinists*, 227 Cal.App.2d 675, 704-705 [39

_____

[4]Defendants may challenge the sufficiency of the evidence to the extent that the challenge results in a holding that plaintiff was not prejudiced by any errors. (Code Civ. Proc., § 906.)

Cal.Rptr. 64]; Rest. 2d Torts, §§ 432, com. c, p. 431, 433B, subsec. (1), p. 441.)

Our initial review of the record suggested that the evidence concerning causation might be inadequate. We requested additional briefing, and, after careful review, have concluded that the evidence of causation is sufficient to justify reaching plaintiff's other contentions. Although defendants produced substantial evidence that their negligence was not a substantial cause of any part of plaintiff's damage, the trial court was entitled to believe plaintiff's version.

In brief, plaintiff's expert Lorenz testified that the debris and water deposited on plaintiff's property was caused at least in part by the debris-filled condition of the basin and the plugged outlet pipe. Defendants' expert Barnes testified that the silt deposit would have been at "least some" less had the basin been cleaned out. He did not dispute that the condition of the basin contributed to the damage. In addition to these two key experts, many other witnesses testified. Their evidence is buttressed by a boxful of charts, maps, photographs and so on. While we do not know precisely what evidence the trial court accepted and rejected, we are satisfied that the record amply sustains the finding which propelled plaintiff over its main hurdle: that defendants' negligence was a substantial factor in causing its damage. The very same evidence, however, also supports the court's finding that not all of plaintiff's damage was the result of defendants' wrongdoing.

### Pleading and Proving Apportionment

█ Plaintiff does not dispute that, in theory at least, this is an appropriate case for apportioning damages in accordance with the principle set forth in section 433A of the Restatement Second of Torts.[5]

---

[5]Section 433A reads as follows:

"(1) Damages for harm are to be apportioned among two or more causes where (a) there are distinct harms, or (b) there is a reasonable basis for determining the contribution of each cause to a single harm. (2) Damages for any other harm cannot be apportioned among two or more causes."

For a number of California decisions on which section 433A is based, see Restatement in the Courts (1970-1971 Supp.), pages 789-793.

Since, on the record before us, plaintiff does not appear to have suffered "distinct harms," apportionment is necessarily dependent on the existence of a "reasonable basis for determining the contribution" of defendants' negligence to the total damage. At this point we note that plaintiff does not claim that no such basis exists: it merely argues that the method of apportioning employed by the trial court was not reasonable in light of the evidence.

Plaintiff also agrees that section 433A is entirely in accord with our law as declared in *Fibreboard Paper Products Corp.* v. *East Bay Union of Machinists, supra,* 227 Cal.App.2d 675, 704-706.

Plaintiff does, however, contend that the issue was not before the trial court, because it had not been raised in defendants' answer.

Plaintiff admits that no case holds that apportionment may not be considered unless pleaded as "new matter" by the defense. Plaintiff analogizes to what it conceives to be the rule where a defendant claims that a plaintiff has failed to mitigate damages. We can accept the analogy without agreeing with plaintiff's conclusion. In *Erler* v. *Five Points Motors, Inc.,* 249 Cal.App.2d 560 [57 Cal.Rptr. 516], the court, after an exhaustive analysis of the authorities, concluded that only where the defense claims that the plaintiff should have mitigated damages, but failed to do so, need the issue be affirmatively pleaded; but where the matter is one of "computation"—that is, of determining the plaintiff's actual out-of-pocket loss—"[i]t can be no surprise nor result in prejudice to a plaintiff" if the court admits evidence on the issue without an affirmative defense pleading. (*Id.,* p. 568.)

Here too it should not have come as a surprise to plaintiff that the issue of apportionment became injected into the case. Given a rational basis for assessing defendants' contribution to the total harm, this was a classic case for apportionment. (E.g., *Connor* v. *Grosso,* 41 Cal.2d 229, 231-232 [259 P.2d 435] [dirt]; *Griffith* v. *Kerrigan,* 109 Cal.App.2d 637, 639-641 [241 P.2d 296] [seepage]; *Katenkamp* v. *Union Realty Co.,* 36 Cal.App.2d 602, 618-619 [98 P.2d 239] [erosion]; *Switzer* v. *Yunt,* 5 Cal.App.2d 71, 79 [41 P.2d 974] [flooding]; *Stephani* v. *Abbott,* 137 Cal.App. 510, 517 [30 P.2d 1033] [flooding]; *California O. Co.* v. *Riverside P.C. Co.,* 50 Cal.App. 522, 524-525 [195 P. 694] [cement dust]. Compare: *Summers* v. *Tice,* 33 Cal.2d 80, 84-85 [199 P.2d 1, 5 A.L.R.2d 91]; *Dauenhauer* v. *Sullivan,* 215 Cal.App.2d 231, 235-236 [30 Cal.Rptr. 71] [earthslide].) Indeed, as will appear, plaintiff was not in the least surprised when the question of apportionment first came up.

Plaintiff also argues, quite correctly, that regardless of the pleading problem, defendants had the burden of proving the extent to which damages could be apportioned. That rule, too, was recognized and applied in *Fibreboard Paper Products Corp.* v. *East Bay Union of Machinists, supra,* 227 Cal.App.2d 675, 704-706. It is also the rule of

section 433B of the Restatement Second of Torts.[6] (See generally, Prosser on Torts (4th ed. 1971) § 52, pp. 317-320; 4 Witkin, Summary of Cal. Law, Torts, § 36.)

Having correctly asserted that defendants had the burden of proof on the question of apportionment, plaintiff would have us go one step further and hold that they failed to carry it as a matter of law. This we cannot do: as stated earlier in this opinion, there was substantial evidence that defendants' negligence did not cause the entire harm. The evidence was accepted by the trial court and nothing indicates that it was under any misapprehension concerning the burden of proof. The only problem is the formula it used.

### Apportionment Formula

■ Defendants made no effort to present specific evidence supporting apportionment. Indeed, the issue never came up until after closing arguments during a discussion between court and counsel. At that time, the court asked whether counsel believed that apportionment of damages might be appropriate. Plaintiff observed that the burden to prove apportionment would be on the defendants; defendants temporized.[7]

The matter was, apparently, not pursued further by either party. The court, working with a record in which neither side had introduced evidence specifically directed to the issue of apportionment, fashioned a formula which unfortunately, indeed inevitably, finds no support in the record.

---

[6]Example 6 of section 433B is based on the facts in *City of Oakland* v. *Pacific Gas & E. Co.,* 47 Cal.App.2d 444, 450 [118 P.2d 328].

[7]"THE COURT: One last question, Gentlemen, that I would like your assistance on if you can give it to me. . . . [W]ould it be possible under the facts and law of this case that the Court could, if it felt the evidence so warranted, indicate there was an increase perhaps of the element of damage that may have otherwise occurred that would be attributable to some conduct of the county without considering that the entire amount of damages were directly the consequence of the county's action?

". . . . . . . . .

"[PLAINTIFF'S ATTORNEY]: In a nutshell, your Honor—these are cases on apportionment—all we must show is a substantial factor. Where you have a substantial factor causing the damages—there are a lot of cases, Restatement and others, indicating that the burden then shifts to the defendant to attempt to apportion. If unable to apportion, as I think has not been done here and would be difficult, it is the defense's burden not sustained in this case so that legally, yes, this is a possibility in any joint, or where you have a natural cause and human cause, but the burden is on the defense until sustained, then I believe we can cite cases that complete recovery—

". . . . . . . . .

"[DEFENDANTS' ATTORNEY]: I think so, your Honor. I frankly don't know that, but apportionment, that occurred to me. . . . I would like an opportunity to brief that. I frankly don't know the answer."

The court based its formula on the failure of the channel to contain the silt that flowed onto plaintiff's property. As noted, it found that when the dam overtopped, debris, silt and mud blocked the channel below the dam, which, in turn, overflowed, inundating a 64-acre area, which area included plaintiff's property, to a depth of 2 feet. It found that defendants had negligently failed to clean out 10.5 acre feet of debris within the basin and 5.0 acre feet of debris in front of the basin, a total of 15.5 acre feet. It then divided 15.5 by 128 and concluded that 12.1 percent of plaintiff's silt damage, and of plaintiff's monetary damage, was caused by defendants' conduct.[8]

It is evident that the trial court's apportionment formula rested on at least one unsupported assumption:[9] that the additional 15.5 acre feet of debris which "plugged and blocked" the channel, caused an equal amount of silt to be deposited on the entire 64 acres affected by the failure of the debris basin. On the evidence in the record it is just as possible that a tiny percentage of the 15.5 acre feet, plugging the channel at the right place, caused the entire 128 acre feet of silt to leave the channel, as it is that 15.5 acre feet of debris, distributed the length of the channel, would not have reduced its capacity to process flowing silt by any substantial amount.[10] All we know is that the trial court did not find the latter alternative to be true—if it had, judgment would have been for defendants—and that it found from the unsatisfactory record with which it was faced that defendants had carried their burden of proof to the extent of satisfying it that *some* apportionment was in order. That, however, is as far as the conflicting experts presented by the parties could carry it. No witness addressed himself to any factual question relevant to the apportionment issue. Plaintiff understandably—though aware of the problem (see fn. 7, *supra*)—did not undertake to satisfy defendants' burden. Defendants perhaps decided to gamble and did not offer proof which, psychologically at least, might have given the court a chance to

[8]Plaintiff understood the court to base the apportionment formula on concededly erroneous assumptions concerning the ability of the *basin* to manage waters, if the capacity of the basin was reduced. Had the trial court assumed that the capacity of the basin was directly correlated to the capacity of the basin to process water and silt, no numerical calculation could yield 12.1 percent responsibility: its water level capacity would have been reduced by at least 80 percent!

[9]A second assumption was a direct arithmetical relationship between volume of silt and monetary damages. The parties have not discussed this problem at all and we merely point out that it will not go away.

[10]The record also permits speculation, again unaided by proof, that since there were several places along the channel where silt broke over its banks, the location and concentration of debris deposits would be relevant to the determination of the degree of defendant's responsibility.

compromise liability and damages. Thus the parties, each for its own reason, gave the court nothing to work with, leaving it to rely on speculation. ▮ Since defendants had the burden on the contested issue, we must reverse; however, in view of the trial court's finding, supported by substantial evidence, that apportionment in some proportion is called for, we cannot, as plaintiff requests, direct entry of judgment in the full amount of its damages.

### *Computation of Lost Profits*

Plaintiff contends that the trial court erroneously deducted the sum of $50,000 for "estimated income tax" in computing plaintiff's loss. The court, however, used both plaintiff's and defendants' figures in computing total damages, and, assuming that it would have been improper to give defendants a credit for such taxes, plaintiff has not demonstrated that the court arrived at its final figure of $456,032 by doing any such thing. We must therefore assume that the court considered the proper factors in arriving at plaintiff's total damages.

### CONCLUSION

The judgment must be, and is reversed, and the case remanded to the trial court, solely on the issue of apportionment of damages.

Stephens, J., and Hastings, J., concurred.